**COASTAL INDUSTRIAL WATER AUTHORITY, Appellant,**

v.

**TRINITY PORTLAND CEMENT DIVISION, GENERAL PORTLAND CEMENT COMPANY, Appellee.**

No. 16454.

Court of Civil Appeals of Texas, Houston (1st Dist.)

April 3, 1975.

Rehearing Denied May 1, 1975.

Jonathan Day, Fred Spence, Houston, for appellant.

William H. White, Grant Cook, Houston, for appellee; Reynolds, White, Allen & Cook, Houston, of counsel.

PEDEN, Justice.

Eminent domain proceeding. Appellant condemned appellee's Tract A, containing 4.4615 acres, and Tract B, containing 161.-3366 acres. The condemnee appealed from the Special Commissioners' award of $788,840 and obtained a judgment for an additional $2,537,473.74.

Appellant presented 76 points of error, which may be grouped into several large categories. Its first thirteen points complain of the admission of evidence as to the value of clay deposits on Tract B. It was undisputed that a portion of Tract B had a substantial deposit of clay suitable for the manufacture of type 1 cement. The appellee is engaged in the cement manufacturing business and since 1927 has continually used clay from Tract B in its Houston plant.

The appellee called only two witnesses who testified as to value. One was Mr. George L. Reed, a real estate appraiser. The other was Mr. Alden McElrath, a mining geologist, who qualified as an expert in evaluating raw materials used in manufacturing cement. He testified in detail as to the results of his tests to determine the quality and quantity of the clay in Tract B. He described the location of the clay, the availability of required transportation and he obtained from the condemnee information about the cost of getting it to the market, which includes mining, transportation and processing costs. McElrath testified that he considered the cost of replacing the lost clay after the land was condemned, and stated that in his opinion the value of the clay in place as of August 14, 1970, the date of taking, was $1,458,282. He said he was not an appraiser and was not testifying to the market value of the land or of the clay, only its value in place. On cross-examination he stated that the value of the clay in place was $1.052 per cubic yard and that his survey showed there were 1,386,202 cubic yards of recoverable usable clay on Tract B, so its total value was $1,458,282.

Appellant complains that this testimony was inadmissible because it involved a computation of quantity times unit price, and because Mr. McElrath took into consideration the cost of extraction and of transporting the clay after it was removed from the ground in determining the value of the clay in the ground.

We do not agree with the appellant's position on this matter. A few Texas cases have discussed this matter. In Brazos River Authority v. Gilliam, 429 S.W.2d 949 (Tex.Civ.App.1968, writ ref. n.r.e.) the court stated at page 952:

"Mineral deposits, when taken as a part of the whole property condemned are proper to be taken into consideration in a determination of the whole value. Brazos River Conservation and Reclam. Dist. v. Costello, 169 S.W.2d 977, 988 (Eastland Civ.App., 1943, writ ref. w.o. m.). It is proper that evidence be heard and considered in eminent domain cases of the value of sand and/or gravel as it lies in its natural state in the ground. Reilly v. State, 382 S.W.2d 116 [Tex.] San Antonio Civ.App.1964, writ ref'd., n.r.e.)."

The court further stated in that case that for an expert witness to assume a value per cubic yard for the gravel in place and to multiply it by the number of cubic yards shown existence on the land "and to be examined and cross-examined upon such calculations as an element in opinion evidence as to value of the realty upon which such had consequential effect is in our opinion procedurally proper."

We quote from 4 Nichols on Eminent Domain (rev. 3rd ed.1974), Section 13.22 beginning at page 13–95:

"   .   .   .   The rule is widely prevalent in this country that the existence of mineral deposits in or on land is an element to be considered in determining the market value of such land   .   .   .

"[T]he rule has been correlatively stated that the value of such mineral deposits cannot be determined independently of the land of which it is a part. The land taken must be valued as land, with the factor of mineral deposits given due consideration. In determining just compensation to be paid to the owner, it is not permissible to aggregate the value of

the land and value of the deposit. Thus, the value as stone land suitable for quarrying—but not the value of the stone separate from the land—is a proper subject of consideration, both by the witnesses and the jury in fixing the amount of just compensation to be awarded. The value of the land is not measured by such facts. The stone is a component part of the land. However, while the profits, price or value of the minerals, taken separately, may not be considered, yet the value, extent and quality of such minerals as exist upon the land may be considered. If the extent and quality and value of the stone as it lies on the land may not be considered, there would be no way by which the value of the land with the minerals could be shown. All legitimate evidence tending to establish value of the land with the minerals in it is permissible. This is not to say that such minerals are to be separately evaluated, but that consideration may be given to the quantity of the mineral that can be extracted and to the value thereof, purely as evidence for arriving at the value of the land. If a piece of land contains valuable improvements, those improvements apart from the land may not be considered. But certainly the character, nature, and extent of the improvements (and the revenue derived therefrom) are as essential to be considered in arriving at the value of the land as the land itself or the uses to which it may be put. The admissibility of such evidence lies in the sound discretion of the court.

"In a leading case the law was summarized as follows:

" '(1) that a landowner in dealing with a parcel of land on which there is a mineral, timber or like substance may not introduce expert testimony by which the expert multiplies the gross material present by the market value per unit thereof and thereby arrives at a figure which purports to be fair market value for the parcel;

" '(2) that the landowner may not by expert testimony capitalized the present or future value of a business enterprise and thereby arrive at fair market value; that rental value may, however, be capitalized;

" '(3) that the landowner is entitled to have an expert or lay witness describe the commodity or substance on the land, the quantity thereof, the going price thereof as *factors* only, upon which the expert may in part base his value as to the *fair market value* of the parcel in question; that the landowner is not entitled to present testimony as to the fair market value of the mineral or timber or other substance apart from the value of the land. * * * In other words, a clear distinction must be drawn between what is presented and considered as a *factor* underlying the expert's opinion as contrasted with opinion as to the fair market value of the substance, timber or mineral itself, apart from the land.

" '(4) that the landowner must make a showing of some sort of market, poor or good, great or small, for the commodity in question before the quantity and price of the commodity or substance may be presented to the jury to be used as a factor in the expert's opinion testimony;

" '(5) that since the inquiry is essentially one as to what would have been the negotiations between the willing buyer and the willing seller, there may be taken into consideration by the expert only those *factors* which would have been reasonably so considered;

" '(6) that except in cases where the matter is so clear that it becomes a question of law it is generally a question for the jury to determine whether the proposed *factor* underlying in part the opinion of the expert as to the fair market

value, is one which would have reasonably been considered by the willing buyer and the willing seller;

" '(7) . . .

" '(8) . . .'

"United States v. Land In Dry Bed of Rosamond Lake, (D.C.Cal.) 143 F.Supp. 314."

Mr. McElrath's testimony gave his opinion as an expert as to the value in place of one element of the value of the property. The offer of Mr. McElrath's testimony was so limited by the witness himself, the appellee, by the court in oral instructions at the time it was offered and at the close of the case in the written instructions in the charge to the jury.

The amount of extractable clay on the property was not questioned by the appellant. The appellant attached the value of $1.052 per cubic yard which Mr. McElrath concluded the clay in place was worth because Mr. McElrath considered the cost of excavation, transportation, and replacement of the clay, which are costs incurred in using the clay as a commodity. There was no testimony before the jury as to the figures which Mr. McElrath assigned to these elements, but he stated these were factors he considered in calculating the value of the clay in place.

■ In connection with a bill of exception, which we will later discuss, McElrath testified that he used two exhibits prepared from the condemnee's invoices and ledgers. They show that in computing the value of clay in place the amount the condemnee paid its suppliers for clay was reduced by the amount the condemnee would have spent in excavating and transporting its clay from the subject property to its cement plant. We think it not improper to deduct such expenses.

■ We hold that if the quantity of a mineral deposit can be accurately deter-mined, an expert may testify to his opinion of the value in place of a cubic yard of the material and multiply it by the number of extractable cubic yards to determine the value of the mineral in place. This is admissible as an element of the market value of the realty.

In its eighth point the appellant complains about the trial court's refusal to strike the testimony of Mr. McElrath that the clay had a value of $1,458,292 when it was discovered in appellee's exhibits 11, 12, 14, 15 and 16 that he had considered, in evaluating the clay, the price paid for it far past the date of taking and into the year 1972 (and did not apply a capitalization factor).

After testifying in detail as to the quantity and quality of the clay, McElrath testified that he had not been furnished with the statistical information he would need before he could give an opinion as to the value of the clay in place.

The next day he testified, as we have noticed, that in his opinion the usable clay in place had a value of $1,458,292 on the date of taking. On cross-examination he said he had made his calculations as to the value of the clay in place on the previous night, based on background information he had received from the attorneys for the condemnee, including cost of transportation and cost of replacement two factors that entered into his opinion.

The condemnee made a bill of exception, contending that because opposing counsel had brought out that McElrath got his background material as to value from condemnee's lawyers, it was entitled to show that such background material and supporting data had come from company records and to show what those records reflect.

McElrath testified in the bill of exception that the figures in exhibits 11 and 12 plus company invoices and ledgers were ones that he used to arrive at his opinion

of the value of the usable clay, the quantity of which he had earlier calculated.

Condemnee's exhibit 12 was offered as part of the bill of exception. It was:

### RE–CAPITULATION

TRINITY PORTLAND DIVISION—GENERAL PORTLAND CEMENT COMPANY COSTS TO EXCAVATE CLAY FROM SUBJECT PROPERTY AND TRANSPORT TO GENERAL PORTLAND PLANT, 1965 – 1970 (AUG.)

| Year | Total Production | Excavation per Unit Price | Transportation per Unit Cost | Total per Unit Cost |
|------|------------------|---------------------------|------------------------------|---------------------|
| 1965 | 151,313 yds. | $.1890 | $.4000 | $ .5890 |
| 1966 | 155,074 | .2153 | .4000 | .6153 |
| 1967 | 178,215 | .1768 | .4000 | .5768 |
| 1968 | 183,768 | .1700 | .3854 | .5554 |
| 1969 | 161,124 | .2500 | .4000 | .6500 |
| 1970 | 122,951 | .6600 | .5000 | 1.1600 |
| (8 mos.) | | | | |
| Average costs (1965–70): | | $.2768 | $.4142 | $ .6910 |

The condemnee used the excavation and transportation figures from its exhibit 12 to compute the amounts shown on its exhibit 11, which were:

### RE-CAPITULATION

CLAY PURCHASED BY TRINITY PORTLAND DIVISION—
GENERAL PORTLAND CEMENT COMPANY,
SEPT. '70 – SEPT. '72

| Cu. Yards | Unit Cost Per Cu. Yd. | Unit Net Cost (3) | Total Net Cost |
|-----------|-----------------------|-------------------|----------------|
| 38,600 | $ .80 (1) | $ .5232 | $ 20,195 |
| 36,000 | 1.00 (1) | .7232 | 26,035 |
| 52,000 | 1.84 (2) | 1.1490 | 59,748 |
| 12,800 | 1.85 (2) | 1.1590 | 14,835 |
| 36,000 | 1.86 (2) | 1.1690 | 42,084 |
| 10,000 | 1.87 (2) | 1.1790 | 11,790 |
| 11,000 | 1.89 (2) | 1.1990 | 13,189 |
| 9,000 | 1.91 (2) | 1.2190 | 10,971 |
| 15,760 | 1.92 (2) | 1.2290 | 19,369 |
| 12,000 | 1.93 (2) | 1.2390 | 14,991 |
| 12,000 | 1.96 (2) | 1.2690 | 15,228 |
| 42,700 | 1.97 (2) | 1.2790 | 54,690 |
| 288,020 | | | $303,125 |

Net cost per cu. yd. = $303,125/288,020 = $1.052

Notes

(1) Including excavation costs only
(2) Including excavation and transportation costs
(3) Exclusive of General Portland historic excavation and transportation costs

McElrath's testimony that the value of the clay in place was $1.052 per cubic yard on August 14, 1970, is the same figure that appears as the "Net cost per cu. yd." as the end result of the calculations in exhibits 11 and 12. In those exhibits it was obtained by taking the average of the rising prices the condemnee paid for clay during a little more than two years after August 14, 1970, rather than by taking the price ($.80) paid at the time of taking of the property. Exhibit 14 shows that $.80 per cubic yard was paid in September, 1970, and in each succeeding month through December, 1970, when the price rose sharply.

It thus appears that McElrath's value testimony may well have been calculated on an incorrect and improper basis. He was not asked to explain the $1.052 figure. The calculations that went into preparing exhibits 11 and 12 were not entirely clear. In appellant's motion to strike the value testimony of the witness, the court was inaccurately advised that the condemnee had used in its calculations "the cost of clay from 1965 clear up to 1972 . . ."; in fact, it used the cost from September 1970 to September 1972.

In ruling on the motion the trial judge expressed a lack of competence to determine how the value of clay in place should be fixed and suggested that the way to determine such issues is to listen to the testimony of experts; that it is a matter to be taken up on cross-examination to test the reasoning of the witness. Appellant's counsel did not thereafter cross-examine the witness as to his use of the exhibits in evaluating the clay.

■ Trial courts are vested with broad discretion in determining whether witnesses are qualified to testify as to the value of real or personal property, and their decisions will not ordinarily be disturbed unless an abuse of that discretion is shown. Under this record we cannot say the trial judge abused his discretion in overruling the motion made by the appellant to strike the testimony as to value.

■ Appellant contends that if a multiplication approach is allowed a capitalization rate should be applied to the value of the clay in place to arrive at present value, because a witness testified it might take fourteen years to mine the clay at the present rate of demand. It might have been mined at a faster rate. The value of the clay in place was not admitted to show its value as an income producing commodity; it was admitted as a factor used in determining the market value of the realty. We hold that the trial court did not err in declining to apply a capitalization factor to the value of the clay.

Appellant objected to this instruction concerning the clay given the jury in the court's charge:

"You are instructed that clay deposits, if any, present in the subsurface of Tract B of the land in question, are to be considered a part of the land, and you are not to consider that they have any market value separate from the land, and when considered in arriving at the amount of compensation to be paid to the landowner, such deposits, if any, can only be considered to the extent that they add to, increase, enhance, or decrease or detract from the value of the land, if they do."

Appellant contends this instruction was a comment on the weight of the evidence regarding the clay on Tract B and that it called the jury's attention to the evidence on the clay.

■ The jury is not allowed to aggregate the value of the clay and value of the land. 4 Nichols on Eminent Domain § 13.-22.

"It is clear that sand, gravel and other material should not be valued separate and apart from the land, and when the value of such materials can be properly shown it should be restricted to the market value of such materials *in place* as they lie in their natural state in the land,

and not after they have been severed from the land and thereby converted into a commodity." Reilly v. State, 382 S.W. 2d 116, 121 (Tex.Civ.App., ref. n. r. e.).

■ The instruction was necessary to inform the jury that they were not permitted to evaluate the clay deposit separately from other uses of the land, and could not add the value of the clay and acreage value to arrive at damages. It was a proper instruction. State v. Adams, 489 S.W.2d 398 (Tex.Civ.App.1972, writ ref. n. r. e.).

Appellant's fourteenth point of error is that the trial court erred in allowing McElrath to testify as to the value of the clay because he gave no basis for his opinion before stating it.

■ If an expert witness cannot supply from personal knowledge or observation the facts upon which his expert inference is to be founded, such facts must be presented hypothetically. 2 McCormick and Ray, Texas Law of Evidence (2nd ed.) 238, § 1402.

■ In our case the figures furnished to McElrath by the condemnee concerning excavation, transportation and replacement costs should have been incorporated into a hypothetical question before the witness testified as to the value of the clay in place, but we hold that the error in failing to require him to first give the basis for his opinion as to value does not require a reversal of the case. The figures in question were, as we have noted, later offered in evidence by the condemnee but they were excluded on the appellant's objection, the basis of which we do not find in the voluminous record of this case.

■ Appellant's fifteenth point of error is based on the trial court's refusal to permit examination of McElrath outside the presence of the jury to determine the basis for his opinion of the value of the clay. We think it would have been well to have permitted voir dire examination of the witness outside the presence of the

jury under the facts of this case, but a trial judge has wide discretion in conducting trials and we find no abuse of the court's discretion in declining to do so here. See City of Waco v. Roberts, 12 S. W.2d 263 (Tex.Civ.App.1928), affirmed, 121 Tex. 217, 48 S.W.2d 577 (1932).

Appellant says the trial court erred in admitting evidence of the sales of eleven tracts of land in the Jacintoport complex, arguing that these were not sales of comparable property because Jacintoport is an industrial subdivision with improvements while the subject property is not. Mr. Reed, appellee's appraiser, stated that Jacintoport was not an industrial subdivision and that the tracts sold in Jacintoport were comparable to the subject property.

Mr. Lewis, an appraiser called by the appellant, testified that Jacintoport was an industrial subdivision, with barge slips, utility and pipeline right of way available, railroad service, electricity, water, natural gas and telephone service, and roadways built throughout the property. This testimony was supported by an undated brochure of Jacintoport Corporation, appearing in the record in a bill of exception.

■ It is not the duty of the court, in jury trials, to resolve conflicts in the testimony of the witnesses. The jury is to decide their credibility and the weight to be given their testimony. Navar v. State, 344 S.W.2d 188 (Tex.Civ.App.1961, no writ), citing McCormick & Ray, Texas Law of Evidence, Sec. 3.

■ It is not error to admit testimony of an expert value witness as to the details of the sale of allegedly comparable property on the ground that it was improved and the subject property was not, where there was no positive testimony as to whether the land was improved at the time of the sale. State v. Dickerson, 370 S.W.2d 742, 745 (Tex.Civ.App.1963, no writ). Jacintoport's development was begun in 1965, and the sales offered were made from December, 1965, through December, 1973. There

is no testimony as to exactly when these improvements were made available.

The appellant also complains about the admission in evidence of testimony by Mr. Reed about sales of several tracts of land because they are on the ship channel while the subject property is on the San Jacinto River.

The highest value placed upon any of the sales offered on the San Jacinto River was $6,500 per acre, while the ship channel properties sold for as high as $25,000 per acre.

■ Mr. Reed testified that the highest and best use of the property would be development for water-related industry in conjunction with the mining of the remaining clay. He testified that the properties in Jacintoport and on the Houston Ship Channel were sold for use by water-related industries and were comparable to the subject property. The trial court has broad discretion in determining whether sales used in forming a basis of opinion of value are of comparable property. Cohn v. State, 438 S.W.2d 860 (Tex.Civ.App., writ ref. n. r. e.) and cases there cited.

■ We hold that the trial judge did not abuse his discretion in admitting testimony about sales of the Jacintoport and of the ship channel properties.

Nor do we find error in the trial court's having permitted the introduction in evidence of the condemnee's exhibit 38, a three-dimensional model of the property. Condemnee limited its offer (outside the hearing of the jury) to the purpose of showing the adaptability of Tract B to its highest and best use as described by the condemnee's appraiser, Reed, and stated that the owner had no future intended use of the property. Appellant says the model contains changes in topography and shows streets, lots, roads, access changes and prospective uses of the tract after the clay had been removed, none of which reflect the condition of the property on the date of taking.

The condemnee offered no evidence of value based on the price it could obtain by selling the property by lots after spending the funds required to develop and subdivide it. In City of Austin v. Cannizzo, 153 Tex. 324, 267 S.W.2d 808 (1954), the Texas Supreme Court approved the admitting of evidence (including plats) of the suitability and adaptability of part of the property involved for a shopping center even though there was then in existence a zoning ordinance which prohibited its use for that purpose. The value testimony in that phase of the case was limited to the present value of the prospective use of the property as a shopping center. The court stated:

"... if it appears reasonably probable to the trial judge that the wants and needs of the particular community may result, within a reasonable time, in the lifting of restrictions, he should admit testimony of present value based on prospective use of the property for purposes not then available."

The court suggested that when such testimony is admitted it would not do violence to the definition of market value suggested in State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194, to have it read:

"You are instructed that the term 'market value' is the price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it, taking into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within the reasonable future."

■ In our case there is no zoning or other regulation which would restrict development of Tract B as the condemnee suggests, but Reed testified that the land

would be suitable for use as shown by the model after the clay had been extracted. We hold that the condemnee's exhibit 38 was admissible as an attempt to show the uses to which the property was reasonably adaptable within the reasonable future. State v. Albright, 337 S.W.2d 509 (Tex. Civ.App.1960, writ ref. n. r. e.).

Appellant also asserts that the trial court erred in defining market value in its charge by following the suggestion made by the Supreme Court in the Cannizzo case which we quoted. We also overrule that point of error.

Appellant complains of the trial court's having excluded testimony by Mr. David Lewis, a real estate appraiser whom it had called as a witness, about two (of four) sales of land which contained clay to be used for manufacturing purposes. Mr. Lewis testified that the sales were to people who bought land for the purpose of utilizing the clay it contained. He did not have any information as to the quantity or quality of the clay on the two tracts in question. We hold that the trial judge did not abuse his broad discretion in ruling that those two tracts were not shown to be comparable. If a tract of land is bought for the minerals it contains, the quantity and quality of those minerals are primary factors in determining its market value.

The appellant complains in point of error 43 that the trial court abused its discretion in excluding Mr. Lewis' testimony concerning the sale from the Bessie M. West Estate to Goodpasture of 89.87 acres of land adjoining the subject land on the south. Mr. Lewis testified that this sale was one of those he used to arrive at his opinion of the market value of the subject property.

We overrule this point. On September 16, 1968, the board of directors of the Coastal Industrial Water Authority, a governmental agency, adopted a resolution expressing its intention to acquire certain specified lands, including this 89.87 acre tract, to accomplish its designated purpose. The deed from the West Estate to Goodpasture was executed on September 24, 1968, and the board's resolution of September 16 was filed for record in the Deed Records of Harris County on October 1, 1968. There is evidence that plans for the project had been under study and development in the area of the subject property for some time and that mineral core borings and other field investigations had been made by the contractors surveying the West property for the Coastal Industrial Water Authority beginning as early as January of 1967.

Evidence presented to the trial judge outside the presence of the jury included a title company's closing statement as to sale of the West Estate tract to Goodpasture bearing this notation:

"Date 7/24/68
Revised 11/19/68"

No explanation was given as to what was revised. The closing statement shows that taxes on the tract were prorated to September 25, 1968; the trial court apparently considered that the sale was made on September 24, 1968, and we find no error in that decision.

In each of three cases decided in recent years the Texas Supreme Court has fixed the date beyond which the condemnee was not entitled to introduce evidence as to sales of property because the values of such properties were probably enhanced by the public facility itself. These cases are City of Dallas v. Shackelford, 145 Tex. 528, 199 S.W.2d 503 (1947); Barshop v. City of Houston, 442 S.W.2d 682 (1969) and City of Fort Worth v. Corbin, 504 S.W.2d 828 (Tex.1974).

In the latter case the Supreme Court stated that enhancement is allowed up to the time that the condemnor manifests a definite purpose to take the particular land.

In our case the question was not one of project enhancement but of whether the

market value of land to be taken for use in the project was depressed by the resolution stating that there was a public necessity for its taking and authorizing proceedings to obtain it.

There was no opinion evidence as to whether the passing of the resolution affected the market value of the 89.87 acre tract, but Mr. Lewis testified before the jury that on July 23, 1968 Mary Gaillard et al conveyed to Goodpasture, Inc. 51 acres of land at $3921.57 per acre. The Gaillard tract adjoins the Bessie M. West Estate 89.87 acre tract on the south and west. Although the West Estate tract has access to both the San Jacinto River and the Crosby-Lynchburg Road, and the Gaillard tract has no access to any road, only to the San Jacinto River, the selling price per acre of the Gaillard tract in July, 1968, was almost twice as much as that of the West Estate tract, which was conveyed a week after passage of the resolution (for about $2,000 per acre). We conclude that absent evidence of other reasons for the difference in sales prices, the trial court did not abuse its discretion in excluding the West to Goodpasture sale as one affected by project influence. The trial judge was entitled to decide 1) that the field investigations and core borings made on the property under the direction of Coastal Industrial Water Authority during the months prior to adoption of the resolution put on notice those interested in property in that vicinity that Coastal Industrial Water Authority had it under consideration, and 2) that when such public agency manifested its definite purpose to take the West Estate tract these two factors gave the tract's owners and its prospective purchasers knowledge of its inclusion in the project or made them aware of the need for inquiry. See City of Fort Worth v. Corbin, supra.

Appellant complains in its 63rd point of error that the trial cout erred in including the words "or decrease in value, if any" in the following instruction given to the jury in the court's charge:

"Since the land in question is located within the boundaries of the project itself, in arriving at your answer to the special issue in this charge which inquires as to the market value of the Trinity Portland Cement Division property, you are instructed not to consider any increase in value, if any, or decrease in value, if any, of that property after September 16, 1968 caused by the location of the Coastal Industrial Water Authority project itself."

The appellant's Requested Instruction No. 4 asked the trial court to instruct the jury to the same effect as to any increase in value after September 16, 1968, but not as to any decrease.

■ We also overrule the 63rd point. In view of the evidence we have noticed we hold that the trial court did not err in instructing the jury not to consider project influence, whether it resulted in an increase or a decrease in value.

The appellant also asserts in other points of error that the trial judge erred in admitting evidence as to sales of properties (other than those we have already discussed) because they were not comparable to the subject tracts. We have examined the evidence as to each of those sales. We think no useful purpose would be served in discussing each of them; we hold that the trial judge did not abuse his broad discretion in passing on the comparability of these sales offered for comparison purposes. Cohn v. State, 438 S.W.2d 860 (Tex.Civ.App.1969, writ ref. n. r. e.).

Coastal Industrial Water Authority argues that the verdict was excessive.

The jury found that the value of Tract A was $270,000 and of Tract B was $2,581,000 on the date of taking.

The appellee's value witness Reed, whose qualifications as an expert in real estate appraisals are not disputed, testified that the value of Tract A on the date of taking was $309,777, which is $1.60 per square

foot and that Tract B's value was $20,500 per acre, or a total value of $3,307,400. He testified outside the hearing of the jury that there was clay worth about $1,300,0000 in Tract B but that he couldn't say he added up the factors of value and that the clay took that part of his total figure. With the jury present Reed testified that the value of the surface of Tract B was right close to its value as he had stated it, with or without the clay but that it is a factor in determining the tract's highest and best use. He said he did not make an independent valuation of the clay himself.

We do not find the verdict to have been excessive. It was less than the value testimony given by Reed, whose opinion as to value is supported by the evidence he submitted as to comparable sales. We do not find that the trial court erred in admitting Reed's testimony or that of McElrath (as to the value of the clay in place) so we hold that the verdict was not excessive.

The amount of damages is always a question of fact for the fact finder and unless the finding is so excessive or so grossly inadequate as to indicate operation of an improper influence in determination of the amount, it will not be disturbed on appeal. Cannon v. State, 473 S.W.2d 325 (Tex.Civ.App.1971, writ ref. n. r. e.) and cases cited.

We find no merit in the condemnor's complaint that the trial court erred in overruling its objection to the court's inquiring, in Special Issue No. 1, as to the value of Tract A separate from that of Tract B. The condemnor's Statement described the two tracts separately, all of the real estate appraisers testified about the tracts separately and used different comparable sales in appraising each tract.

In the appellant's 69th and 70th points of error it argues that the trial court erred in not granting its motion for mistrial when a Mr. Menasco, a prospective juror, related that the City of Houston was trying to take over some property near his home and had wiped out a neighbor of his by paying him World War II prices for his land. Menasco was excused, and condemnor's motion for a mistrial was overruled. Appellant did not ask for it, but the trial judge then gave an instruction to the remaining prospective jurors that persons with feelings like Mr. Menasco's are not entitled to serve on that jury; that land is sold to condemning authorities at a price fixed by agreement or by jury verdict, that the jury is not to be influenced or misled by what Menasco said and nothing he said could have any application to the jury's deliberation in this case. Further, that "this court finds . . . that this proceeding, . . . has been legal, orderly and fair to both parties." At the request of condemnee, the judge added: "Up to this point." He then asked whether any member of the panel felt he could not be fair and impartial after hearing a panelist express himself on what he considers to be a fact. No one responded.

Although Menasco was complaining about the City of Houston's acts, not those of the Coastal Industrial Water Authority, it should be pointed out that counsel for the condemnee had earlier told the panel that the attorneys for Coastal Industrial Water Authority are "in the City Attorney's office."

Appellant complains of the trial court's adding the words "up to this point." We find nothing prejudicial in the adding of those words. That was already the meaning of the judge's statement that the proceeding *has been* legal. Nor do we find error in the court's having overruled the appellant's motion for mistrial. We cannot say that the remarks of the panelist were so prejudicial that the trial judge's instruction did not cure them or that they probably caused the rendition of an improper verdict in this cause. Texas Employers' Insurance Ass'n v. Cruz, 280 S.W.2d 388 (Tex.Civ.App.1955, writ ref. n. r. e.).

**476**

We overrule appellant's points of error 71 and 72, complaining of the trial court's refusal to grant a mistrial or to instruct the jury to disregard opposing counsel's remark that he was glad his clients were in the hands of the jury rather than in the hands of Mr. Spence and his confederates.

The statement complained about was not objected to when made, but the motion by appellant's counsel for a mistrial and his request that the jury be instructed to disregard the remark came after the jury had been taken to the jury room to begin its deliberations.

We think the only thing possibly offensive about the remark was use of the word "confederates". Had an instruction to disregard been promptly requested, it probably should have been given, but we believe it would have unduly emphasized the matter had the judge called the jury back from the jury room to give it.

The attorneys on both sides in this case had engaged in a few personal remarks about their opponents' trial tactics. We find nothing in the remark in question to cause us to say that it was calculated to cause and probably did cause the rendition of an improper verdict and judgment. City of Houston v. Ready, 370 S.W.2d 210 (Tex.Civ.App.1963, no writ).

As to the 73rd point of error, we find no error in the trial judge's having orally reiterated to the jury just before it began its deliberations the instruction in the charge concerning the signing of the verdict.

Appellant's 74th point of error asserts that the trial court erred in entering judgment that appellant pay interest to the date of judgment on the amount of money by which the judgment exceeded the award of the special commissioners.

We overrule this point on authority of Trinity River Authority of Texas v. Sealy & Smith Foundation, 435 S.W.2d 864 (Tex.Civ.App.1968, writ ref.).

Appellant next complains that the trial court's judgment not only allows the condemnee to recover $475,313.74 in interest on the amount by which the judgment exceeds the commissioners' award, as complained about in point of error 74 above, but also allows it to recover interest on the judgment until paid, thus allowing interest on the $475,313.74 in interest. Appellant cites Trinity River Authority v. Sealy & Smith Foundation, supra, in support of its position. The only point of error in that case called upon the court to determine whether the trial court erred in providing for payment of interest on the excess of the amount of the judgment over the amount of the special commissioners' award from the date of deposit.

Since the point with which we are now concerned in our case was not before the court in the case just cited, it was dictum when the court quoted a text stating that interest on the excess "will continue until the final payment of the amount named in the judgment is actually paid to the defendant condemnee. . ."

We consider the interest on the excess to be pre-judgment interest and find no reason why Article 5069–1.05, Vernon's Ann. Texas Civil Statutes does not apply under these circumstances. It states: "All judgments of the courts of this State shall bear interest at the rate of six percent per annum from and after the date of the judgment . . ." For two cases in which the dicta supports the trial court's holding in our case, see State v. Brunson, 461 S.W.2d 681 (Tex.Civ.App.1970, writ ref. n. r. e.) and State v. Griffis, 300 S.W.2d 220 (Tex.Civ.App.1957, writ ref. n. r. e.).

In its 76th and last point of error the appellant urges us to reverse the judgment of the trial court because the cumulative effect of the errors of the trial court caused the rendition of an improper and excessive verdict.

We have held that on almost every matter complained of the trial judge did not err and we have not found reversible error in any of them. We cannot say that the cumulative effect of the trial court's actions caused the rendition of an improper or excessive verdict or judgment.

The other points asserted by the appellant have all been considered by this court and are overruled.

Affirmed.