Edwin T. REILLY et ux., Appellants,

v.

The STATE of Texas, Appellee.

No. 14245.

Court of Civil Appeals of Texas.

San Antonio.

July 29, 1964.

Rehearing Denied Sept. 9, 1964.

Park Street, James K. Gardner, Carlos C. Cadena, San Antonio, for appellants.

Waggoner Carr, Atty. Gen., Carroll R. Graham, T. B. Wright, Asst. Attys. Gen., Austin, for appellee.

MURRAY, Chief Justice.

This is a condemnation suit wherein the State of Texas is seeking to take a portion of appellants' 183 acre tract of land located in Bexar County, a part of which lies within the city limits of San Antonio, for construction of a new interstate controlled access highway. The tract condemned consists of 18.046 acres, all within the City of San Antonio.

A jury trial was had in the County Court at Law No. 3 of Bexar County, and resulted in a verdict fixing the value of the part taken at $37,886.60, and the damage to the remainder of the tract at $10,500.00. Judgment was rendered in keeping with the verdict and Edwin T. Reilly and wife, Lucille Reilly, have prosecuted this appeal.

The parties stipulated that the State of Texas has the right to condemn the property in question, and that all prerequisites of the law have been complied with up to the time of the trial; that the only issues to be determined are the value of the tract taken and the damages to appellants' remaining property.

Appellants' first eight points present the contention that the court erred in excluding evidence (1) of the going price of material excavated from appellants' property, (2) of the income derived from the excavation and sale of material from appellants' property, (3) of the cost of hauling material

such as excavated from appellants' property, (4) of the terms of the lease from Lamar Turner to Emil G. Beck, (5) of the number of cubic yards of material excavated from appellants' property since the beginning of material operations thereon, (6) of the royalty basis for royalty paid under the lease between appellants and Roland Schmidt; (7) that the court erred in sustaining appellee's motion to suppress evidence No. 1, and (8) in repeatedly instructing appellants to introduce no evidence of income, royalties, going price of material and costs of hauling such material. These contentions are briefed together and will be so considered by us.

Appellants acquired the land here involved on August 1, 1955, and since that date have been selling material excavated from such tract, including the land condemned by the State. The effect of the trial court's ruling was to exclude evidence of the profits made by appellants from the sale of such material, consisting of topsoil, fill material and caliche gravel extracted from their land. The top soil, excavated from the entire 18.046-acre tract, was sold separately, and the other material, excavated from depths varying from ten to thirty feet, was sold and loaded on the trucks of appellants' purchasers in an unsegregated state. It was low-grade industrial material which was not suitable for use in highway construction by the State of Texas, but was suitable for many other uses. It consisted of a mixture of various types of earth, clay, gravel, limestone, etc., and was used in construction and repair of city streets, in the construction of parking lots, and by contractors in connection with the construction of slabs, curbs, sidewalks and foundations. During the seven or eight years that appellants had operated the pits there was a steady demand for this material, and there is evidence that this demand will continue.

Appellants' 183-acre tract is located in an area where there are large quantities of the same type of material as is being sold from their land, but appellants contend that they have a unique advantage because the 18.046 acres is located within the city limits, and was being used for the excavation of gravel and other material when taken into the city, and can therefore continue to operate on a non-conforming industry basis, which would not be true of other lands within the city limits. Lands outside the city would be much farther from the market, which would necessitate longer hauls and have other disadvantages.

The State's experts testified that the highest and best use of the property was for a residential subdivision, except the pits and the areas around the pits, and that similar lands which were being sold for residential subdivisions were selling for more money than lands that were bought and sold for the material business. Appellee's witnesses found numerous comparable sales of residential subdivision lands and material lands, which they considered and used in forming their opinions of value. Their range of value for the strip taken was from $900.00 to $1,550.00 per acre, based on its highest and best use as a residential subdivision.

Appellants' expert witnesses testified that, because of the lack of existence of comparable sales, they considered the income and revenue from the property as factors which influenced their opinions of market value. In arriving at a conclusion of the highest and best use of the property, they also considered royalties paid under lease arrangements for extraction of similar material on other properties paid under a lease arrangement with Roland Schmidt during the years 1956 and 1957, the prevailing or "going price" of material excavated from appellants' land, and the standard and customary rate charged for hauling such material to its destination.

Appellants contend that prior to the trial, the court sustained "Plaintiff's Motion to Supress Evidence No. 1," thus preventing appellants from presenting any evidence concerning income, royalties, prevailing or going price of material, or hauling costs.

No such motion and order are in the record, but the record does show that the testimony was excluded during the trial. The trial judge indicated that he was of the opinion that he had excluded such testimony before the trial began.

Appellants contend that had such testimony been admitted, they would have shown that the following income was obtained from excavation and loading of material on appellants' property:

| Year | Gross | Net |
|------|-------|-----|
| 1956 | $ 47,692.28 | $ 32,906.00 |
| 1957 | 62,209.68 | 37,532.08 |
| 1958 | 105,721.82 | 67,562.64 |
| 1959 | 104,502.00 | 63,701.20 |
| 1960 | 82,727.69 | 50,208.19 |
| 1961 | 61,434.46 | 40,612.20 |
| 1962 | 86,198.52 | 53,720.42 |
| TOTAL | $550,486.45 | $346,242.73 |

Thus, it would have been shown that over a seven-year period, the property yielded an average gross income in excess of $78,-000.00, and an average annual net income of amost $50,000.00.

In determining the net income for each year, there was deducted from the gross income the actual cost of operation for such year, without consideration of the depletion allowance granted for federal income tax purposes or depreciation of equipment.

The excluded testimony would also have shown that the area developed to the time of trial was begun on the portion of the land bordering Rosillo Creek, where the available material did not extend to a depth as great as in other portions of the property; and that excavations on other portions of the property had not been pushed to full depth because of water or drainage problems. Appellant Reilly testified that this difficulty would be overcome by using a dragline instead of the shovel which had been used. For these reasons, the excavations were to a depth of 12 to 16 feet. Reilly testified that the land being taken by the State contained saleable material to a depth of 33 feet, that portion being the "peak" of the property. Reilly further testified for the purpose of the Bill of Exception that in his opinion the net income recoverable for the material located in the land being taken would be $17,000.00 to $18,000.00 per acre, if excavated to a depth of 30 feet. Test holes dug within the right-of-way indicated that the material was available at least to such depth.

The excluded testimony of the witnesses Tamon, Reyes, Lipscomb and Reinhardt would also have shown that the going price for "pit run" material (excavated and loaded on the purchaser's trucks at the pit) was .40 per cubic yard for caliche gravel, .30 per cubic yard for fill material, and .50 per cubic yard for topsoil. These prices were for material measured on the truck, or "loose" measure, and did not represent value received for material in place.

The excluded testimony of appellant Reilly would have shown further that the above prices would yield the following net recovery per cubic yard after deducting operating costs: topsoil, .30 to .34; caliche gravel, .24 to .26; and fill material, .18 to .20. His testimony would also have shown that the above prices had remained stable since the beginning of operations.

The court also excluded the amount charged by contractors and truckers for hauling the material. Reilly and Reinhardt would have testified, if permitted, that the charge for hauling was .05 per yard per mile. One of the State's witnesses, Stebbins, if permitted to do so, would have testified that the usual hauling cost per mile for a four or five-yard load was $1.00.

Appellants' witnesses considered all such excluded matters in arriving at their opinion of value, but considered them as factors only. In offering such matters into evidence, appellants stated that such information was being offered only as factors to be considered along with all other facts and circumstances bearing upon value, and not

as constituting, in and of themselves, evidence of value. Appellants further suggested that if it were improper to arrive at value by multiplying the price received for material, times the number of cubic yards remaining in place, this could be cured by appropriate instructions in the charge of the court.

We will first consider the action of the trial court in excluding the evidence relating to the profits made over a period of seven years from the excavating business operated by appellants upon the 183-acre tract. Appellants elected to try this case on the theory of market value, so it will not be necessary to discuss other various concepts of value. In Herndon v. Housing Authority of City of Dallas, Tex.Civ.App., 261 S.W.2d 221, the Court, in discussing the admissibility of evidence of gross receipts and profit of the owner's business conducted upon property to be taken, said:

"This very question is the subject of an annotation in 7 A.L.R. 163. Here is the rule as stated on page 164 in the annotation:

" 'With remarkable unanimity the American jurisdictions hold that evidence of profits derived from a business conducted on property is too speculative, uncertain, and remote to be considered as a basis for computing or ascertaining the market value of the property in condemnation proceedings.'

"The reasons generally given to support the rule are: (1) Ordinarily the amount of profit depends more upon the capital invested, general business conditions, and the trading skill and business capacity of the person conducting it than it does upon the location of the business. Gauley & E. R. Co. v. Conley, 84 W.Va. 489, 100 S.E. 290, 7 A.L.R. 157; and (2) it is only the real estate which is being taken, not the business. The owner may keep his business and continue to operate it at a different location."

The Court goes on to say that this rule is not to be confused with the rule that permits evidence of profits where a stone quarry is located on the condemned land, in such event the owner may show his profits from the quarry business because it is part of the intrinsic nature of the land itself. In support of this statement the Court cites: Orleans County Quarry Co. v. State, 172 App.Div. 863, 173 App.Div. 990, 159 N.Y.S. 30, and Seattle & M. R. Co. v. Roeder, 30 Wash. 244, 70 P. 498. This statement was not necessary to the decision and was therefore obiter dicta and furthermore the two cases cited do not so hold. These cases go no further than to hold that under such circumstances the market value of the stone or other natural material *in place in the land* would be admissible.

In 22 Tex.Jur.2d 575, § 173, it is stated:

"However, profits derived from a business conducted on property are too speculative, uncertain, and remote to be considered as a basis for computing or ascertaining market value of property in condemnation proceedings inasmuch as business profits ordinarily depend on factors other than location, and inasmuch as the owner may keep his business and operate it at a different location."

This rule is applied only where the whole of the property is taken, and where only a part of the property is taken the rule may be different, but in the case at bar the only claim of damages as to the remaining property was the loss of a fifty-foot strip as a retainer wall.

Appellants cite a number of cases contending that it was error to exclude evidence of the profits derived from their excavation business, but these cases do not sustain their contentions when carefully analyzed. These cases go no further than to hold that the market value of the material *in place* or *in situ* may be shown.

Appellee offered evidence of seven comparable sales of land containing gravel and

other materials, and appellants have presented no point contending that the court erred in permitting evidence of these sales as not being comparable. While appellants' value experts testified that they were unable to find any sales of comparable lands, this was insufficient under all the facts and circumstances to establish the fact that there were no comparable sales.

■ To illustrate, the rule allows evidence to be heard as to the value of the gravel or other material as *it lies in its natural state in the ground,* sometimes referred to as *in place* or *in situ,* and does not allow evidence of the value of the gravel or other material after it is taken from the ground and has become a commodity in commerce. For instance, in State v. Mottman Mercantile Co., 51 Wash.2d 722, 321 P.2d 912, the Court said:

"This error stems from a well recognized and sound general rule, i. e., that it is improper to arrive at a conclusion concerning the value of property which has a mineral content by multiplying the assumed number of cubic yards of material available times a given price per unit. * * *

"However, from the generally recognized rule to which we have referred, the state reasoned that evidence of the present value of gravel, in its natural state, on a cubic yard basis was inadmissible, which is a *non sequitur.*"

In Georgia Kaolin Co. v. United States 5 Cir. 1954, 214 F.2d 284, the Court said:

"In eminent domain proceedings, the existence of valuable mineral deposits in the condemned land constitutes an element which may be taken into consideration if and in so far as it influences the market value of the land. The reason for this rule is said to be that the measure of compensation in such cases is the market value of the land to be condemned, taken as a whole and with due consideration of all the components that tend to make its market value."

In Seattle & M. R. Co. v. Roeder, 30 Wash. 244, 70 P. 498, the Court said:

"This land has a special value as stone-producing land. The owners, therefore, are entitled to compensation according to its value as such. * * * It is like lands with buildings thereon, or timber land, or lands having any other commodity which is a part of the land itself. * * * If the extent and quality and value of the stone as it lies on the land may not be considered, there would be no way by which the value of the land with the stone could be shown."

To the same effect is United States v. Land in Dry Bed of Rosamond Lake, S.D. Cal., 1956, 143 F.Supp. 314; National Brick Co. v. United States, 1942, 76 U.S.App.D.C. 329, 131 F.2d 30; United States v. Rayno, 1 Cir. 1943, 136 F.2d 376; Cade v. United States, 4 Cir. 1954, 213 F.2d 138. The other decisions cited by appellants do not sustain them in their contention.

■ It is clear that sand, gravel and other material should not be valued separate and apart from the land, and when the value of such materials can be properly shown it should be restricted to the market value of such materials *in place* as they lie in their natural state in the land, and not after they have been severed from the land and thereby converted into a commodity. The value or price of material excavated from appellants' property would not be admissible for any reason, because after excavation the same becomes personalty. W. B. Johnson Drilling Co. v. Lacy, Tex.Civ.App., 336 S.W.2d 230.

■ Under the Texas decisions income or profits from a business are admissible in evidence in condemnation cases in only two situations: (1) In those cases where the landowner's business has been temporarily interrupted because of a denial of access the landowner can recover his loss of profits as an element of damage. Hart Bros. v. Dallas County, Tex.Com.App., 279

S.W. 1111; City of La Grange v. Pieratt, 142 Tex. 23, 175 S.W.2d 243; Gandy v. State, Tex.Civ.App., 293 S.W.2d 534. (2) In those cases where only a part of the landowner's land is taken, an owner may show loss of profits as an injury to his business, not as a separate item of damage, but as affecting the market value of the remaining land and improvements for the uses to which they were adapted and were being put. City of Dallas v. Priolo, 150 Tex. 423, 242 S.W.2d 176; Milam County v. Akers, Tex.Civ.App., 181 S.W.2d 719.

The appellants do not fit in either class of the above cases. There is no pleading or proof as to a temporary interruption of business as a denial of access, and appellants admit that there was no damage to their land not taken or to their business, except for the loss of approximately five acres from excavation because of the necessity to leave fifty feet of lateral support along both sides at the right-of-way.

■ With the exception of the above two mentioned situations, the Courts have held that business profits are too uncertain, speculative, conjectural and remote to be considered as a basis for computing market value. State v. Parkey, Tex.Civ.App., 295 S.W.2d 457. This Court has held that future profits from a farming operation are of no value in passing upon the question of market value, because they are too speculative. Lower Nueces River Water Supply Dist. v. Sellers, 323 S.W.2d 324.

■ Testimony as to special royalty payments are inadmissible for three reasons: (1) Because the value of material after the same is excavated is not admissible, (2) for the same reasons that income and profits are not admissible, and (3) because a royalty is nothing more than an option to purchase in the future, and such options are not admissible. State v. Williams, Tex.Civ. App., 357 S.W.2d 799. Appellants' first eight points are overruled.

■ Appellants' ninth, tenth, eleventh and twelfth points present the contention that there is no evidence, and in any event the evidence is insufficient to support the jury's answers to Issues Nos. One, Three and Four, finding respectively that the value of the land taken was $37,886.60; that the value of the remaining property before the taking was $198,064.80, and after the taking, $187,564.80. We overrule these points because the answers of the jury were well supported by the comparable sales testified to by the witnesses of appellee.

Appellants' remaining points are overruled because we are of the opinion that if any error is presented by these points it did not amount to such a denial of the rights of appellants as is reasonably calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, Texas Rules of Civil Procedure.

The judgment is affirmed.