IN THE SUPREME COURT OF TEXAS








IN THE SUPREME 
COURT OF TEXAS
════════════
No. 08-0061
════════════
The 
State of Texas, Petitioner
v.
Central Expressway Sign 
Associates, et al., Respondents
════════════════════════════════════════════════════
On 
Petition for Review from the
Court of Appeals for the Fifth District of 
Texas
════════════════════════════════════════════════════
 
Argued January 13, 
2009
 
 
            
Justice O’Neill delivered the opinion of the Court.
            
The Texas Constitution provides that “[n]o person’s property shall be 
taken, damaged or destroyed for or applied to public use without adequate 
compensation being made, unless by the consent of such person.” Tex. Const. art. I, § 
17. Adequate compensation does not include profits generated by a 
business located on condemned land. Herndon v. Hous. Auth., 261 S.W.2d 221, 222–23 (Tex. Civ. App.—Dallas 1953, writ ref’d). In this case, the State condemned 
an easement that was leased to an advertising company for the purpose of 
erecting a billboard and selling advertising space. The trial court struck the 
condemnor’s expert witness as unreliable for failing 
to include in his estimate of fair market value the income the billboard 
generated from advertising sales. Because the State’s expert applied an accepted 
methodology for valuing the condemned property, we conclude the trial court 
reversibly erred in excluding his testimony.
I. Background
            
The State filed a petition to condemn a 3,950-square foot parcel of land 
in Dallas that was needed to improve a highway interchange. Central Expressway 
Sign Associates (CESA) held an easement for the construction and operation of a 
billboard on an 1,801-square foot parcel, most of which 
was contained in the parcel to be condemned. The easement was leased to Viacom 
Outdoor, Inc., for the greater of $11,000 per year or twenty-five percent of 
billboard advertising revenues after paying limited agency commissions, with the 
base rent rising to $11,500 after one year and $12,000 after two. Viacom sold 
advertising space on a billboard that had been constructed on the property. At 
the time of condemnation, the billboard generated $168,000 per year in 
advertising revenue. After court-appointed special commissioners determined that 
the fair market value of the property to all of the interest holders was 
$2,012,300,[1] the State objected and demanded a jury 
trial. The State reached a settlement agreement with the underlying fee owner 
and another leaseholder, and the State acquired title to the fee interest. The 
State also settled its condemnation suit against Viacom by agreeing to pay 
relocation benefits, and Viacom relocated its billboard to a new location. Thus, 
this case does not involve the acquisition of a billboard structure and Viacom 
was able to place its billboard elsewhere. Viacom remained a party to the 
State’s suit against CESA, however, because of a 
dispute arising out of the settlement agreement over interest and attorneys’ 
fees, which dispute proceeded separately from the trial on the merits between 
the State and CESA. As a result, the trial court’s final judgment included 
acquisition of both CESA’s and Viacom’s interests in 
the property.
            
Before trial, the State challenged CESA’s 
appraisal expert, claiming that he had improperly included in his appraisal 
business profits that Viacom’s billboard generated and had mischaracterized the 
billboard structure as realty rather than personalty. 
The trial court struck CESA’s expert for 
mischaracterizing the billboard structure, and neither Viacom nor CESA challenge 
that ruling here. The trial court also granted CESA’s 
challenge to the State’s expert appraiser, Grant Wall. Wall used the income 
approach to valuing property, which estimates future rental income generated by 
the property and applies a capitalization rate to arrive at a present value. 
Wall capitalized the income Viacom paid CESA in rent for the easement, and 
estimated the fair market value to be $359,817. Because Viacom was paying a 
market rent, Wall assigned no value to the leasehold interest. At a pretrial 
hearing, the trial court excluded Wall’s testimony as unreliable because he did 
not include billboard advertising revenues in his appraisal. As a result, CESA’s two principals, George Allen and Randolph Perry, 
offered the only estimates of the property’s value. They both estimated the 
property was worth $2,500,000. The jury found the fair market value of the 
property to be $1,850,000, and the trial court entered a judgment for that 
amount. The court of appeals affirmed. ___ S.W.3d ___. 
We granted the State’s petition for review to consider the reliability of its 
expert’s methodology in estimating the fair market value of the condemned 
property.
II. Standard of Review
            
An expert’s opinion, to be admissible, must be relevant and reliable. 
Exxon Pipeline Co. v. Zwahr, 
88 S.W.3d 623, 628 (Tex. 2002). To be relevant, the expert’s opinion must 
be based on the facts; to be reliable, the opinion must 
be based on sound reasoning and methodology. Id. at 629; Merrell Dow 
Pharms., Inc. v. Havner, 953 S.W.2d 
706, 714 (Tex. 1997). We review a trial court’s determination that a witness’s 
testimony is unreliable for an abuse of discretion. Helena 
Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001). A trial court 
abuses its discretion in excluding expert testimony if the testimony is relevant 
to the issues in the case and is based on a reliable foundation. Zwahr, 88 S.W.3d at 628; 
Helena Chem. Co., 47 S.W.3d at 499.
            
For the exclusion of evidence to constitute reversible error, the 
complaining party must show that (1) the trial court committed error and (2) the 
error probably caused the rendition of an improper judgment. McCraw v. Maris, 828 
S.W.2d 756, 757 (Tex. 1992); Gee v. Liberty Mut. 
Fire Ins. Co., 765 S.W.2d 
394, 396 (Tex. 1989). We have recognized the impossibility of 
prescribing a specific test to determine whether a particular error is harmful, 
and entrust that determination to the sound discretion of the reviewing court. 
McCraw, 828 S.W.2d at 
757–58; Lorusso v. Members Mut. Ins. Co., 603 S.W.2d 818, 821 (Tex. 1980). 
In making this determination, the court must review the entire record. 
Gee, 765 S.W.2d at 396; Lorusso, 603 
S.W.2d at 821. “[I]t is not necessary for the complaining party to prove that 
‘but for’ the exclusion of evidence, a different judgment would necessarily have 
resulted.” McCraw, 828 S.W.2d 
at 758. The complaining party must only show “that the exclusion of 
evidence probably resulted in the rendition of an improper judgment.” Id. 
The role that excluded evidence plays in the context of the trial is also 
important. Thus, the exclusion or admission is likely harmless if the evidence 
was cumulative, or the rest of the evidence was so one-sided that the error 
likely made no difference in the judgment. Reliance Steel 
& Aluminum Co. v. Sevcik, 267 S.W.3d 867, 873 
(Tex. 2008). But if erroneously admitted or excluded evidence was crucial 
to a key issue, the error is likely harmful. Id.
III. Exclusion of Grant Wall’s Testimony
            
The State argues that it is entitled to a new trial because the trial 
court erred in excluding expert appraiser Grant Wall’s testimony. The trial 
court found that Wall’s testimony was unreliable because he did not include 
billboard advertising revenues in his estimate of the easement’s value. Texas 
recognizes three approaches to determining the market value of condemned 
property: the comparable sales method, the cost method, and the income method. 
City of Harlingen v. Estate of Sharboneau, 48 S.W.3d 177, 182 (Tex. 2001). The 
comparable sales method is the favored approach, but when comparable sales 
figures are not available, courts will accept testimony based on the other two 
methods. Id. at 182–83. The cost approach looks 
to the cost of replacing the condemned property minus depreciation. Id. 
at 183 (citing Religious of the Sacred Heart v. City of Houston, 836 
S.W.2d 606, 615–16 (Tex. 1992)). The income approach is appropriate when the 
property would be priced according to the rental income it generates. Sharboneau, 48 S.W.3d at 183 (citing Polk County 
v. Tenneco, Inc., 554 S.W.2d 918, 921 (Tex. 1977)). All three methods are 
designed to approximate the amount a willing buyer would pay a willing seller 
for the property. Id. 
Texas law 
allows income from a business operated on the property to be considered in a 
condemnation proceeding in two situations: (1) when the taking, damaging, or 
destruction of property causes a material and substantial interference with 
access to one’s property, see City of Austin v. The Avenue Corp., 
704 S.W.2d 11, 13 (Tex. 1986); and (2) when only a part of the land has been 
taken, so that lost profits may demonstrate the effect on the market value of 
the remaining land and improvements, see City of Dallas v. Priolo, 242 S.W.2d 176, 179 (Tex. 1951). Absent one of 
these two situations, income from a business operated on the property is not 
recoverable and should not be included in a condemnation award. Courts have 
applied this rule for two reasons: first, because profits from a business are 
speculative and often depend more upon the capital invested, general market 
conditions, and the business skill of the person conducting it than it does on 
the business’s location; and second, because only the real estate and not the 
business has been taken and the owner can presumably continue to operate the 
business at another location. Herndon, 261 S.W.2d at 
223.
            
Texas courts have refused to consider business income in making 
condemnation awards even when there is evidence that the business’s location is 
crucial to its success. See, e.g., State v. Rogers, 772 S.W.2d 
559, 561–62 (Tex. App.—Amarillo 1989, writ denied) (refusing consideration of 
“going concern” and “goodwill” values of auto parts store that caters to and 
depends upon nearby businesses); City of Austin v. Casiraghi, 656 S.W.2d 576, 579–80 (Tex. App.—Austin 
1983, no writ) (refusing to consider business income of well-located 
restaurant); State v. Villareal, 319 S.W.2d 408, 410 (Tex. Civ. App.—San Antonio 1958, writ ref’d n.r.e.) (upholding exclusion of evidence of income generated by 
grocery store); Marshall v. City of Amarillo, 302 S.W.2d 943, 945 (Tex. 
Civ. App.—Amarillo 1957, no writ) (refusing to 
consider income generated by pawn shop).
            
CESA and Viacom argue that billboard advertising revenue is derived from 
the intrinsic value of the land, and therefore that revenue should be treated 
like rental income for purposes of an income-method appraisal. In support of 
their position, they cite Herndon, in which the court of appeals refused 
to consider income from a grocery business operated on condemned land, but noted 
that evidence of “rents and profits derived from the intrinsic nature of the 
real estate itself” would be admissible. 261 S.W.2d at 
223. The Herndon court cited several examples from other states, 
including cases where income derived from a stone quarry, agricultural and 
livestock operations, and toll roads and bridges has been considered in placing 
a value on condemned land. Id.
            
Other states that have addressed this issue have come to varying 
conclusions. Some have held that the revenue from billboard advertising should 
not be considered in estimating the market value of condemned property. See, e.g., Comm’r of Transp. v. Rocky Mountain, LLC, 894 A.2d 259, 283–85 
(Conn. 2006); City of Newport Mun. 
Hous. Comm’n v. Turner Adver., 
Inc., 334 S.W.2d 767, 770–71 (Ky. 1960); State Dept. of Transp. & Dev. v. Chachere, 574 So. 2d 1306, 1310–11 
(La. Ct. App. 1991); Wray. v. Stvartak, 700 N.E.2d 347, 354 (Ohio Ct. App. 1997); 
In Re Urban Redevelopment Auth., 272 A.2d 163, 165 (Pa. 1970); 
Vivid, Inc. v. Fiedler, 580 N.W.2d 644, 658–59 (Wisc. 1998). These courts reason that billboard 
advertising revenues are too speculative to use as an estimate of the fair 
market value of land, see Turner, 334 S.W.2d at 770, and that any portion 
of the revenues attributable to the sign’s location should be reflected in the 
fair rental value of the premises, see In Re Urban Redevelopment Authority of 
Pittsburgh, 272 A.2d at 165. And although the court of appeals cited 
Vivid, Inc. v. Fiedler as supporting its opinion, in fact the majority of 
the justices opined that an appraisal based on billboard advertising income 
impermissibly compensates for business profits. 580 N.W.2d at 
658. The Wisconsin Supreme Court emphasized that the billboard owner is a 
“comprehensive advertising enterprise” that “actively markets the availability 
of its billboards, employs an artist to create the advertising copy for its 
clients, and creates the actual advertisement materials.” Id. 
Accordingly, the trial court was directed to closely examine the offered 
appraisal to ensure that it did not include compensation for business income. 
Id. at 659.
            
Other states have decided that billboard advertising revenues may 
properly be considered in estimating the value of real property. See State 
Dept. of Transp. v. Powell, 721 So. 2d 795, 798 (Fla. Dist. Ct. App. 1998); In re Acquisition of 
Billboard Leases & Easements, 517 N.W.2d 872, 873 (Mich. Ct. App. 1994); 
State v. 3M Nat’l Adver. Co., 653 A.2d 1092, 1094, 1096 
(N.H. 1995); Lamar Corp. v. Commonwealth Transp. Comm’r, 552 S.E.2d 61, 66 (Va. 2001).
            
But Texas courts have not recognized the exception alluded to in 
Herndon for business profits “derived from the intrinsic nature of the 
real estate.” 261 S.W.2d at 223. Profits from an 
existing farming business have been excluded as unreliable evidence of a 
property’s value because they depend on 
weather, labor, market conditions, and other factors that may vary from year to 
year. See Bridges v. Trinity River Auth., 570 S.W.2d 
50, 53–54 (Tex. Civ. App.—Tyler 1978, writ ref’d. n.r.e.) (citing Lower Nueces River Water Supply Dist. v. 
Sellers, 323 S.W.2d 324 (Tex. Civ. App.—San 
Antonio 1959, writ ref’d. n.r.e.). Texas courts have also excluded evidence of profits 
from mining businesses operated on condemned land. See Nelson v. 
Jefferson County, No. 09-95-208CV, 1997 Tex. App. LEXIS 4411 (Tex. 
App.—Beaumont Aug. 14, 1997, pet. denied) (not designated for publication) 
(affirming trial court’s exclusion of evidence that land was particularly 
suitable for future dirt pit operations); Reilly v. State, 382 S.W.2d 
116, 120–21 (Tex. Civ. App.—San Antonio 1964, writ 
ref’d n.r.e.) (affirming trial court’s exclusion of evidence of income 
derived from selling topsoil and caliche gravel). In 
Reilly, evidence of the value of gravel or other material as it lies in 
its natural state in the ground was held admissible, but evidence to show the 
value of material that had been taken from the ground and had become a commodity 
was excluded. 382 S.W.2d at 121; see also State v. Angerman, 664 S.W.2d 794, 796 (Tex. App.—Waco 1984, writ 
ref’d n.r.e.) (holding there was no error in instructing jury to consider 
gravel deposits only as “a part of the land” and not as having any market value 
separate from the land).
            
We are not inclined to create an exception for land on which a billboard 
is placed. Although CESA and Viacom consider billboards unique, there is nothing 
to indicate that a billboard’s location is any more significant to their 
business than it would be to a retail establishment whose profitability depends 
upon visibility and easy access. Moreover, profits from a billboard advertising 
business depend upon more than just the land itself. The business involves 
securing permits for the operation of billboards, constructing, lighting, and 
maintaining the billboards, and employing personnel to sell advertising space 
and to place and remove the advertisements. If there were no business effort or 
skill involved in operating a billboard business beyond “renting” the space to 
advertisers, one would expect the rental rate of the easement to more closely 
approximate the advertising income Viacom received. Viacom and CESA cannot argue 
simultaneously that (1) the billboard generates $168,000 per year in advertising 
income while CESA only charges Viacom the greater of $12,000 per year or 
twenty-five percent of advertising revenue; and (2) Viacom does not employ any 
business skill beyond that of a “landlord” in order to profit from this 
arrangement. If, as CESA and Viacom argue, the operation of a billboard is much 
like renting real property, CESA would have no reason to charge so much less in 
rent than Viacom receives from its advertising sales.
            
If CESA were charging less in rent than the easement is truly worth, 
Wall’s appraisal method still would not undervalue the property because it adds 
the lease’s “bonus value” to the capitalized rental income. The bonus value is 
the value of the leasehold’s use and occupancy for the remainder of the tenant’s 
term, plus the value of any renewal right, less the agreed rent. Luby v. 
City of Dallas, 396 S.W.2d 192, 198 (Tex. Civ. 
App.—Dallas 1965, writ ref’d n.r.e.). This value is calculated as part of the 
award when condemned property is subject to a lease. Id. Wall calculated 
this value as zero because Viacom was paying a rent that was comparable to what 
it would pay to rent similar properties.
            
Viacom and CESA argue that Wall’s appraisal violates the “undivided-fee 
rule” and was properly excluded by the trial court on 
this basis alone. The undivided-fee rule states that when real property has been 
carved into different interests, the property is valued for condemnation 
purposes as if it were owned by a single party. State v. 
Ware, 86 S.W.3d 817, 822 (Tex. App.—Austin 2002, no pet.); Aronoff v. City of Dallas, 316 S.W.2d 302, 
307–08 (Tex. Civ. App.—Texarkana 1958, writ ref’d n.r.e.). Under the 
undivided-fee rule, the sum of the different interests cannot exceed the value 
of the property when viewed as a single estate. Ware, 86 S.W.3d at 824. The purpose of the rule is to award full 
compensation for the land itself, and not for the sum of the different parts. 
Id. at 824. Thus, while each interest-holder is 
entitled to a share of the compensation award, the award should be paid for the 
property itself, then apportioned between them. Aronoff, 316 S.W.2d at 
307–08. When the property is subject to a lease, the fact-finder first 
determines the market value of the entire property as though it belonged to one 
person, then apportions that value between the lessee and the owner of the fee. 
Urban Renewal Agency v. Trammel, 407 S.W.2d 773, 774 (Tex. 1966) (citing 
Aronoff, 316 S.W.2d at 302).
            
According to CESA and Viacom, Wall failed to correctly apply the 
undivided-fee rule because he did not value the leasehold estate. This argument 
both misinterprets the undivided-fee rule and misunderstands Wall’s appraisal. 
The rule merely ensures that the goal of an appraiser will always be to 
approximate what the entire property would sell for in a market transaction. It 
does not guarantee that any individual interest will be assigned a value greater 
than zero for purposes of calculating the value of the whole.
            
Contrary to what CESA and Viacom suggest, Wall did value the entire 
property, which in this case was the easement because the State had already 
acquired the underlying fee. The easement had been divided up into CESA’s leased fee and Viacom’s leasehold. Wall calculated 
the value of the whole by determining the value of each of these interests. He 
concluded that the leasehold had no value because the agreed rent was not less 
than the fair rental value of the easement. Moreover, Wall’s appraisal did not 
overlook the value of the property as a billboard location because he valued the 
easement as put to its highest and best use. The rent Viacom paid CESA, which 
formed the basis of Wall’s income-method appraisal, also accounted for the value 
of the location; a property better-suited to billboard advertising would 
presumably be able to command a higher rent.
            
Thus, we hold that Wall’s testimony reflected an accepted and reliable 
method of appraising the condemned easement and it should not have been 
excluded. We believe the error was reversible because Wall’s testimony was 
directly related to the central issue in the case, the value of the condemned 
property.
            
The State also argues that the trial court erred in admitting the 
testimony of CESA’s principals because their estimates 
were based on billboard advertising revenues. CESA and Viacom argue that the 
principals’ testimony was based on their knowledge of the fair market value of 
the property as owners and as persons involved in the Dallas real estate market. 
It is not clear that the principals’ testimony was based on advertising revenue, 
although they did mention it. Under Texas law, an owner of property is qualified 
to testify to the property’s market value. Porras v. Craig, 675 
S.W.2d 503, 504 (Tex. 1984). On remand, the trial court should not allow 
evidence of valuation based on advertising income. General estimates of what the 
property would sell for considering its possible use as a billboard site are 
acceptable.
IV. Conclusion
            
We conclude that the trial court abused its discretion in excluding 
Wall’s testimony. We reverse the judgment of the court of appeals and remand for 
a new trial.
 
___________________________________
Harriet O’Neill
Justice
 
OPINION DELIVERED: June 26, 
2009








[1] The special 
commissioners’ award was divided as follows:
 
CLBJ, 
Inc., fee owner              
$280,000
Perry 
(Eller), a leaseholder        
$784,500
CESA, 
easement holder            
$100,000
Viacom, 
leaseholder                 
$847,800